# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| FRANCHESCA PAOLA CORNELIO CUEVAS, | No.  59474-9-II |
| Respondent, | |
| v. | |
| MUSAH KORAM ALI, | UNPUBLISHED OPINION |
| Appellant. | |

LEE, J. — Musah K. Ali appeals a domestic violence protection order (DVPO) restraining him from contacting Franchesca P. Cornelio-Cuevas.  Ali argues that the superior court commissioner and judge abused their discretion by considering a police dispatcher's statement about men of African descent, and that the superior court judge erred by denying revision and denying Ali's request to change venue.  Cornelio-Cuevas seeks attorney fees and costs on appeal.

We affirm and award Cornelio-Cuevas attorney fees and costs on appeal.

## FACTS

### A.    BACKGROUND AND PETITION

Cornelio-Cuevas and Ali have a daughter, AC, who was born in December 2020.  The couple bought a house in Black Diamond, Washington, in 2022 and married in September 2023.  Ali's mother moved into the Black Diamond house in December 2023. One day in early January 2024, Cornelio-Cuevas left the house with AC, purportedly to "go to the African market."  Clerk's

Papers (CP) at 97. Ali's "mom insisted on coming." CP at 97. Cornelio-Cuevas then went to a police station, telling police that she needed help getting away from Ali. Police put Cornelio-Cuevas in contact with a crisis team, and secured her and AC housing. An officer drove Ali's mother home from the police station.

Several days later, Cornelio-Cuevas filed a petition for a DVPO against Ali in Pierce County. The petition asserted that Ali drank alcohol every day. Cornelio-Cuevas stated that she was a "hostage" inside the house and that Ali would block her from leaving the house with AC, including one instance where Ali left with the family's only car so that Cornelio-Cuevas could not take AC—who had several medical conditions—to a doctor's appointment. CP at 73 (boldface omitted). Cornelio-Cuevas also asserted that Ali had struck her across the face, took her phone from her and broke it when she tried to call 911, took and maxed out her credit cards, closed their joint bank account, and moved his mother into the house to control and surveil Cornelio-Cuevas. Cornelio-Cuevas stated that Ali had contacted the couple's bank about removing Cornelio-Cuevas from the deeds of the houses the couple owned in Washington and New Jersey.

Cornelio-Cuevas also stated that Ali had threatened to take AC away from her and move back to Ghana on multiple occasions. "The last fight that we had, he said I could not support her and that he has everything he needs to take her away from me." CP at 98.

A friend of Cornelio-Cuevas submitted a declaration repeating many of the same assertions Cornelio-Cuevas made. In part, the friend stated that Ali drank every day and "threatened to take [AC], their child[,] away from" Cornelio-Cuevas. CP at 103.

The police chaplain, who Cornelio-Cuevas and AC stayed with after they contacted the police, also filed a declaration. The chaplain observed:

2

> As time went on I was able to talk with [Cornelio-Cuevas] more and more about her situation at home. You could see the fear in her eyes as she talked about the physical and emotional abuse as well as the manipulation from her husband. Also it was very clear she feared for her daughter. Specifically that her husband would take her daughter to Africa with his mother with[]out her permission. Knowing that once [AC] was gone getting her back would be impossible.

CP at 107.

In response to the petition, Ali argued that Cornelio-Cuevas could not corroborate many of her claims of physical or verbal abuse. He denied intentionally interfering with AC's medical appointments. And Ali asserted that he only called the bank about "what to do with the liability and ownership" of the couple's houses after telling Cornelio-Cuevas that he wanted to separate. CP at 128. Ali filed for dissolution of the marriage in King County in late January 2024.

Ali also submitted the police report that was created when Cornelio-Cuevas went to the police station. In that report, an officer stated that Cornelio-Cuevas relayed her fears about losing AC: "[Cornelio-Cuevas] believes [Ali] brought his mother to take AC from [Cornelio-Cuevas] and take her back to Ghana to hide her." CP at 148. "[Cornelio-Cuevas] stated [Ali] has told her the government will take AC away from her if she reports anything." CP at 148. The officer also stated that the officer spoke to a dispatcher for the mobile crisis team: "The dispatcher I spoke with informed me she was of African descent and stated the fear of losing AC was real as using children is a common way African men control their wives." CP at 148-49. The officer then stated, "Based on the information I ha[ve] been provided, it appear[s] [Ali] has been using the fear of losing AC to control [Cornelio-Cuevas]." CP at 149.

At the hearing on the DVPO petition, Cornelio-Cuevas agreed with and reaffirmed the information in her filings related to the petition for a DVPO. Cornelio-Cuevas also testified that

3

she remained "really scared" for herself and AC. CP at 270. She stated, "I don't want to be part of the list of women being murdered by the[ir] ex-partners." CP at 270.

B.    DVPO RULING

After hearing from the parties, the commissioner explained that under chapter 7.105 RCW, which governs protection orders, "the petition is evidence for the Court to consider; standing on its own. It does not need any corroboration whatsoever." CP at 282. And the evidence presented did not have to follow the rules of evidence, "with very narrow exceptions" that did not apply in this case. CP at 269; *see* RCW 7.105.200(8).

The commissioner entered a DVPO restricting Ali from contacting Cornelio-Cuevas and AC. The commissioner found by a preponderance of the evidence that Ali had committed acts constituting domestic violence and coercive control as defined in RCW 7.105.010. And the commissioner found Cornelio-Cuevas' "credibility most convincing and most compelling." CP at 283.

In its findings, the commissioner provided examples of Ali's behavior that constituted domestic violence. The commissioner found that Cornelio-Cuevas' claims about Ali trying to remove her from the house deeds, "controlling her accounts, maxing out her credits cards, [and] taking account information out of her name" were all credible, and that Ali's actions were "done in an orderly and systematic way." CP at 284. The commissioner also found that Ali moved his mother into the Black Diamond home "to maintain control and maintain observation and maintain another method of coercion against petitioner, relative to the minor child." CP at 285. The commissioner further found that Ali had "hit petitioner multiple times in the face with an open hand." CP at 224 (capitalization omitted). "When petitioner tried to call 911, respondent took

4

[her] phone away and broke it." CP at 224 (capitalization omitted). And the commissioner found that Ali had blocked Cornelio-Cuevas from taking AC to a doctor's appointment.

The commissioner observed that there "may be issues in the family law case in King County that have to do with cultural or religious issues—I, quite frankly, don't find that to be controlling here." CP at 283. The commissioner prohibited any passport being issued for AC and stated, "If these parties have . . . any kind of impetus to consider fleeing the United States, I'm including in this order all the Hague abduction convention language . . . which can be a felony if a party violates the Court's orders relative to where a child can be transported." CP at 285.

The commissioner ordered Ali to undergo mental health, domestic violence perpetrator, and chemical dependency evaluations and treatment, and suspended his visitation with AC pending compliance with those programs or subject to any parenting plan entered in the dissolution case. The commissioner awarded Cornelio-Cuevas attorney fees.

C.   MOTIONS FOR REVISION AND RECONSIDERATION

Ali moved to revise the commissioner's ruling. In this motion, Ali argued for the first time that none of the parties lived in Pierce County, so venue was improper. Cornelio-Cuevas argued that Ali waived any challenge to venue by not objecting to venue in his responsive pleadings to the DVPO petition. At the revision hearing, Ali acknowledged that he had not previously objected to venue.

Ali also argued that the commissioner had relied on racist stereotypes in imposing the DVPO and that there was no corroborating evidence to support Cornelio-Cuevas' claims of domestic violence. Ali specifically asserted that the statement made by the police dispatcher, which was included in the police report Ali submitted, was based on racist stereotypes. Ali

reasoned that the police dispatcher's statement had then been adopted by Cornelio-Cuevas and other declarants such as the police chaplain who housed Cornelio-Cuevas.

The superior court judge expressly stated that they were not considering the police dispatcher's statement:

> I do want to say that the statement of the Black Diamond Police dispatcher has absolute zero credibility with this Court and . . . I'm not considering it. I don't disagree with [Ali's] characterization of it. It's just a very broad-brush description, and, you know, this Court is certainly not a court that accepts those types of broad-brush [statements]—so I want to make that clear.

Verbatim Rep. of Proc. (VRP) at 6. And the superior court judge disagreed with Ali's assertion that the commissioner and other declarants had relied on the police dispatcher's statement.

> But your motion says that [the commissioner], through his behavior and rulings, relied on this statement. And so I carefully combed through the transcript, because I very much take that accusation seriously, and I could not find a section of the transcript where [the commissioner] relied on that, and the closest I came was . . . when he's referencing potential religious or cultural issues but notes that that would be something for the parenting plan court ultimately to consider, and that specifically he did not find that controlling here.
>
> . . . .
>
> . . . I also reviewed the declaration of . . . the chaplain, and nowhere in that declaration did he say that he was relying on these sorts of generalizations by the police dispatcher. And when I reviewed the declaration of [the chaplain], it seemed that he was relying on the petitioner's statements, and it's not just the police dispatcher, because, again, the petitioner also said that your client threatened to take their child back to Ghana. So that appeared to me to be what [the chaplain] was relying on in sort of his observations of her demeanor as opposed to the statement made by the police dispatcher.

VRP at 6-7. The superior court judge also observed that it was not even clear if the police officer writing the report had adopted the dispatcher's statement:

> To be clear, the statement came from the police dispatcher, and it's something that was documented by the Black Diamond police officer, not necessarily adopted by

No. 59474-9-II

the Black Diamond police officer. That's a distinction. You know, they're tasked with documenting anything relating to their case, so I . . . want to make sure that, you know, the record is clear about that. I didn't see anything in the report . . . where the police officer adopted that.

VRP at 10.

The superior court judge ultimately denied Ali's motion for revision:

I'm going to find that venue is proper under 7.105.075(4), and if for some reason it wasn't, I find that the respondent waived it by not asserting it or moving for a change of venue to King County. The Court does have jurisdiction over the state of Washington, but venue is a little bit different from jurisdiction. You have to actually assert venue.

With respect to corroboration [of Cornelio-Cuevas' statements in her petition], that's not error because corroboration is not required under the statute, although it can be helpful. But here I do think that there is corroboration. I think that perhaps most telling and most importantly were the declaration of [the police chaplain] and the circumstances in which the report was made in which she left the home with the respondent's mother and drove to the police department, which corroborates her accusation that she was not free to leave without the respondent's mother being present, as well as some of the documentation from the hospital staff about the effect that respondent's demeanor had on the petitioner [during AC's birth].

And . . . the chaplain, in his declaration described [Cornelio-Cuevas'] demeanor and her sincere belief and concern that the respondent was going to take their child, which was separate and apart from anything the police dispatcher said. Because I'm going to be quite clear, that plays absolutely no role in this Court's decision, nor do I find that it played a role in [the commissioner's] decision. As I said, I carefully scoured the record to see if there was any support for that, and I didn't find it.

[The commissioner] made very specific findings about the financial control, which I agree with. Taking steps to remove the petitioner from the deeds at such an early juncture, the credit cards, the closing of the joint accounts, as well as the necessity for the petitioner having to stay with the chaplain and his wife for a week following them vacating the home.

So I think that is all corroborating evidence. And preponderance of the evidence, it is a low standard. It is 50.1 percent. And I do find that there was a preponderance of the evidence here that warranted the domestic violence protection

7

order for both the financial control aspect of it . . . as well as the acts of domestic violence, to include the allegations of striking and the breaking of the phone.

Also persuasive for the Court was the declaration from the petitioner's friend describing her sort of walking the petitioner through reporting of the domestic violence, which is consistent with the fear that's described by [the police chaplain].

So I am going to deny the motion for revision.

VRP at 15-17. The superior court judge explained that they were adopting the commissioner's findings of fact and conclusions of law, and expressly stated that they did "not consider anything said by [the] Black Diamond Police dispatcher nor does [the] record reflect that [the commissioner] did so." CP at 314.

Ali then moved for reconsideration of the order denying revision, arguing that there was no corroborating evidence of Cornelio-Cuevas' claims and that Ali had not waived his challenge to venue. The superior court judge denied Ali's motion for reconsideration. Ali appeals.

## ANALYSIS

### A.    POLICE DISPATCHER'S STATEMENT

Ali argues that the superior court commissioner erred by considering the police dispatcher's statement. Ali contends that the commissioner had a duty to prevent racist evidence from entering the courtroom and failed to do so. Ali asserts that the superior court judge had an identical duty and similarly failed. Ali also argues that, because the commissioner and judge learned of the police dispatcher's statement, we must reverse and remand for a new DVPO hearing before a different commissioner "who would not be affected by the racist bias against Appellant that has transpired here." Br. of Appellant at 22.

8

Cornelio-Cuevas responds that, in issuing the DVPO, the commissioner made, and the trial court adopted, findings required by chapter 7.105 RCW which were supported by substantial evidence. She emphasizes that judges and commissioners regularly hear and disregard inadmissible evidence, and that both the commissioner and superior court judge in this case "made careful note to disavow and not consider" the police dispatcher's statement. Br. of Resp't at 20.

1.      Legal Principles

All superior court commissioner rulings are subject to revision by a superior court judge. RCW 2.24.050. A superior court judge's review of a commissioner's ruling on a motion for revision "is limited to the evidence and issues presented to the commissioner." *In re Marriage of Moody*, 137 Wn.2d 979, 993, 976 P.2d 1240 (1999); RCW 2.24.050. If the evidence before the commissioner did not include live testimony, "then the superior court judge's review of the record is de novo." *Moody*, 137 Wn.2d at 993.

On appeal, "we review the superior court's decision, not the commissioner's order." *In re Knight*, 178 Wn. App. 929, 936, 317 P.3d 1068 (2014). "[T]he findings and orders of a court commissioner not successfully revised become the orders and findings of the superior court." *Maldonado v. Maldonado*, 197 Wn. App. 779, 789, 391 P.3d 546 (2017). The denial of a motion for revision "constitutes an adoption of the commissioner's decision," and the superior court "is not required to enter separate findings and conclusions." *Id*. "We review the superior court's findings for substantial evidence." *Knight*, 178 Wn. App. at 936. And we "defer to the trier of fact on the persuasiveness of the evidence, witness credibility, and conflicting testimony." *Id*. at 937. "Unchallenged findings of fact are verities on appeal." *Seven Hills, LLC v. Chelan County*, 198 Wn.2d 371, 384, 495 P.3d 778 (2021).

9

We review a decision to grant or deny a DVPO for abuse of discretion. *Maldonado*, 197 Wn. App. at 789. "An abuse of discretion is found when a trial judge's decision is exercised on untenable grounds or for untenable reasons, or if its decision was reached by applying the wrong legal standard." *Id*.

The rules of evidence do not apply to DVPO hearings, "other than with respect to privileges, the requirements of the rape shield statute under RCW 9A.44.020, and evidence rules 412 and 413." RCW 7.105.200(8). A court "shall issue" a DVPO "if it finds by a preponderance of the evidence" that "the petitioner has been subjected to domestic violence by the respondent." RCW 7.105.225(1)(a). The definition of domestic violence in chapter 7.105 RCW includes coercive control. RCW 7.105.010(9)(a). "Coercive control" is "a pattern of behavior that is used to cause another to suffer physical, emotional, or psychological harm, and in purpose or effect unreasonably interferes with a person's free will and personal liberty." RCW 7.105.010(4)(a). Coercive control can include intimidating or "controlling or compelling conduct" by "[c]ommunicating, directly or indirectly, the intent to . . . [h]arm the other party's children" and "[d]epriving the other party of basic necessities or committing other forms of financial exploitation." RCW 7.105.010(4)(a)(i)(E)(I), (4)(a)(iii).

2.      Analysis

As a preliminary matter, the police dispatcher's statement only entered the record because Ali attached the police report containing the statement to his responsive declaration. "The original goal of the invited error doctrine was to 'prohibit[] a party from setting up an error at trial and then complaining of it on appeal.'" *City of Seattle v. Patu*, 147 Wn.2d 717, 720, 58 P.3d 273 (2002) (alteration in original) (quoting *State v. Pam,* 101 Wn.2d 507, 511, 680 P.2d 762 (1984)). "Since

10

then, the doctrine has been applied even in cases where the error resulted from neither negligence nor bad faith." *Id*. Here, the challenged statement only entered the record because Ali submitted it.

Regardless of any invited error, Ali's claim fails. Ali relies on *State v. Zamora*, 199 Wn.2d 698, 722, 512 P.3d 512 (2022) and *Henderson v. Thompson*, 200 Wn.2d 417, 423, 518 P.3d 1011 (2022), *cert. denied*, 143 S. Ct. 2412 (2023) to argue that the commissioner and superior court judge "failed in [their] duty to 'eradicate racism and prejudice.'" Br. of Appellant at 19 (quoting *Henderson*, 200 Wn.2d at 421).

*Zamora* held that race-based prosecutorial misconduct, which is a "flagrant or apparently intentional appeal to the jurors' potential racial or ethnic bias," can never constitute a harmless error. 199 Wn.2d at 721. *Henderson* held that a civil plaintiff is entitled to an evidentiary hearing on a motion for a new trial under CR 59 if they present "a prima facie case that an objective observer could conclude that racial bias was a factor in the jury's verdict." 200 Wn.2d at 429. Neither case addresses a bench trial or similar non-jury proceeding, where, as Cornelio-Cuevas notes, "judges routinely hear inadmissible evidence that they are presumed to ignore when making decisions." *Harris v. Rivera*, 454 U.S. 339, 346, 102 S. Ct. 460, 465, 70 L. Ed. 2d 530 (1981).

Here, we review the judge's ruling, not the commissioner's. *Knight*, 178 Wn. App. 936. Because Ali highlighted the police dispatcher's statement in his motion for revision, the judge "carefully combed through the transcript" for evidence that the commissioner allowed bias to infiltrate their ruling; the judge found none. VRP at 6. The judge found that the police dispatcher's statement had "absolute zero credibility with this Court" and explained that the judge was not considering the statement in deciding the case. VRP at 6. And the judge found that the police

officer making the report had not adopted the dispatcher's statement, but was merely reporting the statement alongside Cornelio-Cuevas' statement that she thought Ali was going to take AC away from her. Also, the judge found that Cornelio-Cuevas' own statements and the police chaplain's observation that Cornelio-Cuevas was afraid that Ali would take AC away from her were independent from, not based on, the police dispatcher's statement. There is no evidence that Cornelio-Cuevas or the police chaplain knew about the police dispatcher's statement. The judge further found that Cornelio-Cuevas' and the police chaplain's statements and other evidence, such as Ali's acknowledgement that he had contacted the bank about removing Cornelio-Cuevas from the house deeds, corroborated Cornelio-Cuevas' claims and amounted to a preponderance of evidence that warranted the DVPO. Ali has not challenged any of the judge's findings, so they are verities on appeal. *Seven Hills*, 198 Wn.2d at 384.

There is no evidence in the record that the superior court judge considered the racial generalization in the police dispatcher's statement. And with no challenge to the judge's findings, those findings constitute a preponderance of the evidence that Cornelio-Cuevas was the victim of domestic violence. Accordingly, the superior court judge did not abuse their discretion by denying revision of the commissioner's order imposing the DVPO. *Maldonado*, 197 Wn. App. at 789.

B.     VENUE

Ali argues that the superior court judge erred by denying his request to change venue. Ali contends that the request to change venue was not untimely when raised for the first time in a motion for revision because the revision hearing was de novo review of the original DVPO. Cornelio-Cuevas responds that, under CR 12, Ali waived his right to object to venue by failing to object or move to change venue before his motion for revision. We agree with Cornelio-Cuevas.

"This court reviews a venue decision for manifest abuse of discretion," which "occurs when no reasonable person would adopt the trial court's position." *Unger v. Cauchon*, 118 Wn. App. 165, 170, 73 P.3d 1005 (2003).

A challenge to venue is properly preserved by raising the challenge in responsive pleadings or by bringing a motion challenging venue prior to filing the responsive pleading. CR 12(b)(3); *Voicelink Data Servs., Inc. v. Datapulse, Inc.*, 86 Wn. App. 613, 626, 937 P.2d 1158 (1997). A party waives a challenge to venue when the party fails to raise the venue challenge in the responsive pleading or in a motion made before filing the responsive pleading. CR 12(h)(1)(B).

Here, Ali acknowledged that he did not raise the venue issue in his response to the petition for a DVPO before the commissioner, and he only raised the venue issue in his motion for revision to the superior court judge after the commissioner granted Cornelio-Cuevas a DVPO. Thus, the superior court did not abuse its discretion in denying Ali's request to change venue on a motion for revision because Ali had waived his right to object to venue.[1]

## ATTORNEY FEES AND COSTS

Cornelio-Cuevas requests attorney fees and costs on appeal pursuant to RAP 18.1 and RCW 7.105.310(1)(j). RAP 18.1(a) authorizes an award of attorney fees and expenses on appeal if "applicable law grants to a party the right to recover reasonable attorney fees or expenses on review." RCW 7.105.310(1) allows a court that issues a protection order "broad discretion" to grant additional relief, including requiring "the respondent to pay the administrative court costs and service fees, . . . and to reimburse the petitioner for costs incurred in bringing the action,

---

[1] *Cf. Moody*, 137 Wn.2d at 993 (stating that a superior court's review of a commissioner's ruling on a motion for revision "is limited to the evidence and issues presented to the commissioner").

13

including reasonable attorneys' fees." RCW 7.105.310(1)(j). And "[a] court may require the respondent to pay the petitioner for costs incurred in responding to a motion to modify or terminate a protection order, including reasonable attorneys' fees." RCW 7.105.500(9). "'If [attorney] fees are allowable at trial, the prevailing party may recover fees on appeal as well." *Sullivan v. Schuyler*, 31 Wn. App. 2d 791, 814, 556 P.3d 157 (2024) (awarding fees in a similar case) (quoting *Landberg v. Carlson*, 108 Wn. App. 749, 758, 33 P.3d 406 (2001), *review denied*, 146 Wn.2d 1008 (2002)).

Here, we affirm the protection order, so Cornelio-Cuevas is entitled to attorney fees on appeal. Accordingly, we award Cornelio-Cuevas attorney fees and costs on appeal.

CONCLUSION

We affirm. We also award Cornelio-Cuevas attorney fees and costs on appeal.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, J.

We concur:

Cruser, C.J.

Price, J.